IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |
|---|---|
| MELANIE GRIMES, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) Case No. CV-03-TMP-1401-S |
| | ) |
| FLINT LIDDON; HEBSON, LIDDON, | ) |
| and SLATE; | ) |
| | ) |
| Defendants. | ) |

**<u>MEMORANDUM OPINION</u>**

This action is before the court on two motions for summary judgment. The first was filed July 1, 2004, by defendant Southlaw, P.C.[1]; the second was filed July 15, 2004, by the individual defendant, Flint Liddon.  Both motions were supported by briefs and evidentiary submissions.  At a conference on July 28, 2004, plaintiff sought additional time in which to conduct discovery before responding to the motions for summary judgment, which was granted in an order entered August 3, 2004, extending the deadline for responding to the motions.  The extended deadline for

---

[1]  The complaint alleged that this defendant existed as a partnership, Hebson, Liddon & Slate, in which the individual defendant, Flint Liddon, was a partner.  The answer and subsequent motions all identify the defendant as Southlaw, P.C., a professional corporation.  In fact, attached to the defendant's motion for summary judgment is the affidavit of Tony Hebson, in which he testifies that he incorporated Southlaw, P.C., in 1997, before the plaintiff was employed in November 2000.  The plaintiff has not contested this testimony, and the court treats it as undisputed.  Thus, the relationship between Liddon and Southlaw is not that of a common-law partner to partnership, but that of a shareholder and employee to a corporate employer.

responding to the motions passed on October 11, 2004, without the plaintiff filing any response to them. Defendants filed "reply" briefs on November 16 and 24, respectively, pointing out the plaintiff had not filed a response to their motions. On December 7, 2004, however, the court received a letter from plaintiff's counsel asking that counsel be given "a week or so" in which to file "a meritorious opposition to the motions."[2] By order entered December 9, 2004, the court treated the letter as a motion and, in an effort to provide plaintiff with a fair opportunity for an adjudication on the merits, directed plaintiff's counsel to file the opposition no later than noon on Friday, December 17, 2004, and to hand deliver a copy to the undersigned's chambers. To date, plaintiff still has failed or declined to provide any opposition to the motions for summary judgment, which are taken under advisement based on the record now before the court.

The parties consented to the exercise of jurisdiction by the undersigned pursuant to 28 U.S.C. § 636(c) on September 24, 2004. Notwithstanding the plaintiff's failure to oppose the motions for summary judgment, the court finds that defendant Southlaw's motion is due to be granted in part and denied in part. Defendant

---

[2]     Although the letter indicates that opposing counsel was copied, counsel for the individual defendant stated to the court on or about December 8, 2004, that he did not receive a copy of the letter.

Liddon's motion likewise will be granted in part and denied in part.

## I. SUMMARY JUDGMENT STANDARD

Under Federal Rule of Civil Procedure 56(c), summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The party seeking summary judgment "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of 'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)). The movant can meet this burden by presenting evidence showing there is no dispute of material fact, or by showing that the nonmoving party has failed to present evidence in support of some element of its case on which it bears the ultimate burden of proof. Celotex, 477 U.S. at 322-23. There is no requirement, however, "that the moving party support its motion with affidavits or other similar materials negating the opponent's claim." Id. at 323.

Once the moving party has met his burden, Rule 56(e) "requires the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'specific facts showing that there is a genuine issue for trial.'" Id. at 324 (quoting Fed. R. Civ. P. 56(e)). The nonmoving party need not present evidence in a form necessary for admission at trial; however, she may not merely rest on her pleadings. Celotex, 477 U.S. at 324. "[T]he plain language of Rule 56(c) mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Id. at 322.

After the plaintiff has properly responded to a proper motion for summary judgment, the court must grant the motion if there is no genuine issue of material fact, and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c). The substantive law will identify which facts are material and which are irrelevant. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. at 248. "[T]he judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. His

4

guide is the same standard necessary to direct a verdict: "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Id. at 251-52; see also Bill Johnson's Restaurants, Inc. v. N.L.R.B., 461 U.S. 731, 745 n.11 (1983). However, the nonmoving party "must do more than show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted. Anderson, 477 U.S. at 249 (citations omitted); accord Spence v. Zimmerman, 873 F.2d 256 (11th Cir. 1989). Furthermore, the court must "view the evidence presented through the prism of the substantive evidentiary burden," so there must be sufficient evidence on which the jury could reasonably find for the plaintiff. Anderson, 477 U.S. at 254; Cottle v. Storer Communication, Inc., 849 F.2d 570, 575 (11th Cir. 1988). Nevertheless, credibility determinations, the weighing of evidence, and the drawing of inferences from the facts are the function of the jury, and therefore the evidence of the non-movants is to be believed and all justifiable inferences are to be drawn in his favor. Anderson, 477 U.S. at 255. The non-movant need not be given the benefit of every inference but only of every reasonable inference. Brown v. City of Clewiston, 848 F.2d 1534, 1540 n.12 (11th Cir. 1988).

## II.   FACTS

Because the plaintiff has failed to respond to the motions for summary judgment, the facts recited here come principally for the evidentiary submissions of the defendants, which include a copy of the plaintiff's deposition.  Nonetheless, the court has attempted to view that evidence in the light most favorable to the plaintiff, as required by Rule 56, keeping in mind that the moving defendants have the initial burden of demonstrating "the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (quoting Fed. R. Civ. P. 56(c)).   Doing so, the following undisputed facts are relevant to the instant motions.

Melanie Grimes, a female, was hired by the law firm of Southlaw, P.C., as a legal secretary in November 2000.[3] She worked directly for one of the firm's attorneys and shareholders, Flint Liddon.  As indicated by the "P.C." designation and the affidavit of Tony Hebson, the firm was a professional corporation, not a partnership.

Grimes alleges that soon after she began to work for Southlaw under Liddon's supervision, he would ask her to sit on his lap.  On one occasion, he pulled her by the hips onto his lap, but she got up and left his office.  He repeatedly asked her to sit in his lap, about once a week during the first year she worked there.   The

---

[3]   Southlaw mistakenly argues in its brief that Grimes's employment began in November 2002, but the complaint and the evidence suggest that Grimes was hired in November 2000.

requests became more frequent over time, and eventually he was asking her to sit on his lap almost every day.  Grimes refused the requests by laughing it off and telling him he was "crazy."  Liddon frequently placed his hand on her buttocks, in response to which she would tell him to stop it or would push his hand away.  She told him to "quit being stupid," and she said to him, "I don't play where I get paid."

Grimes also alleges that Liddon flicked a pen off of his desk and asked Grimes to pick it up so he could "look at her ass."  She picked up the pen while facing him so that he could not see her from behind.  After that, on at least two other occasions, he would flick the pen off of his desk and ask Grimes to pick it up so that he could "look down [her] shirt."

After Grimes had been vacationing at the beach, Liddon asked her, "Are your boobs tanned too?  Can I see?"  In response, Grimes said she "laughed and kept dictating or kept doing my work, and then he went out the door."  On one occasion,[4] plaintiff asked Liddon to lend her $500.  He replied, "Hell, I'll give you $1,000 if you will blow me."  She replied, "Well, that's not going to happen."  On at least one other occasion, Liddon talked to Grimes

---

[4]     Plaintiff states in her deposition that this request was made in March 2000, but this date cannot be correct because she did not begin working at Southlaw until November 2000.  However, she also states it happened after or about the same time that the President came to Birmingham, which plaintiff has clearly testified was in June 2002.

about the size of his penis.  She testified in deposition that she laughed when he made these comments, but she also testified that she was upset by these events.[5]

In November 2001, Grimes was attacked by her boyfriend.  She told Liddon about the boyfriend's arrest, and Liddon told her not to go to her boyfriend's arraignment on assault charges.  Later

---

[5]  At pages 192-193 of her deposition, plaintiff testified as follows:

Q:  Did you go screaming and crying out of his office?
A:  No, I did not.
Q:  What was said before you say he pulled you down on his lap?
A:  I really don't recall.
Q:  Do you recall anything?
A:  I just recall standing there putting something on his calendar.  And he went and sat down in his chair, and when he did that he pulled me into the chair with him. I jumped up and started laughing like it was no big thing and left.
Q:  When did it become a big thing?
A:  When it continued to happen.
Q:  And when was that?
A:  It happened — like I said, once a week he would touch me or touch my behind and say I had a nice ass or come sit on my lap, pat his knee and say, "Come sit on my lap," that kind of thing.
Q:  I know you are saying he did all of those things, but what I want to know is specifically — the first time it was not a big thing, but you are saying at some point it became a big thing.  I want to know when that is.
A:  I never said it became a big thing.  You said that.
Q:  Did it ever become a big thing?
A:  It became what it became.  It continued on happening, and then once the courtroom thing happened it became almost every day.
Q:  Was it upsetting to you before the courtroom incident?
A:  Yes, but I was going through a lot of other stuff at the time.

that day, on her lunch break, Grimes went to her boyfriend's arraignment, where Liddon walked into the courtroom proceedings, tapped her on the shoulder, shook his finger in her face, and screamed, "You're fired." Liddon called her later that afternoon, however, and asked if he could come by her house the next day to talk. Grimes agreed. When they met the next day, Liddon told her he wanted her to come back to work for him because she was the best secretary he had ever had. She returned to work at Southlaw the following day. She agreed to return in spite of Liddon's conduct because she needed her job and didn't want to have to look for another job or be out of work and miss paying a rent or car payment.

After she returned to work, Grimes claims that Liddon began to make sexual remarks to her more often. In response to sexual remarks, Grimes would "laugh and tell him he's crazy or stupid or something like that." She received sexually explicit e-mails from Liddon, and she sent sexually explicit e-mails to him. She did not find the e-mails to be offensive. In December 2001, Tony Hebson, another shareholder at Southlaw, sent an e-mail to all employees instructing them to stop sending sexually explicit e-mails at work. After that date, Grimes sent an e-mail to another female employee, asking her if she had kissed or was "doing the nasty" with Liddon.

9

In June 2002, Grimes sent an e-mail to Liddon asking if she and a female co-worker could borrow $1,000 each in order to attend a luncheon for President George W. Bush, who was visiting Birmingham for a fund-raiser.  Liddon responded, in person, that he would lend her $2,000 if she and the co-worker would "do a threesome" with him.  Grimes went to get the co-worker because she wanted her to hear what Liddon had said.  He repeated his statement, and she and her co-worker just laughed and walked off.

In August or September 2002, Liddon asked Grimes to do some work at his desk and touched her on the buttocks, then slid his hand inside her thigh.  She left his office immediately and went to the restroom because she was "a little upset" and "embarrassed." She then washed her face and hands and went back to work.

During her tenure at Southlaw, Grimes asked for raises but never got one.   In 2002, however, Liddon agreed to pay the plaintiff an extra $200 each payday for a total pay increase of $400 per month.[6]

Grimes admits that she knew that Liddon's conduct toward her was illegal, but that she did not complain to anyone at Southlaw about Liddon's conduct.  Southlaw, however, did not have a written

---

[6]    The payment apparently was made directly to her from Liddon, not in the form of an increase in her bimonthly paycheck. Earlier in her job at Southlaw, she apparently had received a similar extra payment each payday from Tony Hebson.  Grimes says the payments were made directly from the partners so that the firm's bookkeeper wouldn't know how much she was making.

anti-discrimination policy or any complaint procedures.  Grimes was familiar with sexual-harassment cases because she had worked on employment-discrimination files many times in her career as a legal assistant and legal secretary.

On or about October 9, 2002, plaintiff's attorney, Marvin Stewart,[7] sent a letter to Southlaw claiming that Grimes was being sexually harassed.  The letter referenced a tape recording Grimes made of Liddon shortly before the date of the letter, and it contained an affidavit purportedly signed by another Southlaw employee who had witnessed the incident in which Liddon offered to pay the employees for a "threesome."[8]  After receiving the letter, Southlaw placed Grimes on paid leave while investigating her claims.  During the investigation, employees reported to Hebson that plaintiff had taken cocaine at work, and that Grimes often talked about her sex life while at work.  Hebson fired Grimes on October 21, 2002.  Hebson asserts that he did so because he believed she had used illegal drugs while working at Southlaw.

Plaintiff began to work as a legal secretary at another firm in Birmingham while she was on leave, and earned the same salary

---

[7]     Plaintiff is now represented by a different attorney.

[8]     Defendant has offered the affidavit of the same employee, in which she indicates that the affidavit attached to the letter from Marvin Stewart is a forgery and disavows any knowledge of the subject matter.

she had earned at Southlaw, minus the additional $400 per month Liddon had paid her.

On January 23, 2003, Grimes filed a charge of discrimination with the Equal Employment Opportunity Commission.[9] She received a right-to-sue letter on March 14, 2003, and filed the complaint that commenced this lawsuit on May 9, 2003, filing it in the Circuit Court of Jefferson County, Alabama.  The defendants removed it to this court on June 12, 2003.  Plaintiff alleges claims against both the corporate and individual defendants on the basis that: (1) she was subjected to unlawful sexual harassment by Liddon while employed at Southlaw; (2) Southlaw retaliated against her in violation of Title VII after she complained about the harassment;[10] (3) she was a victim of assault and battery when Liddon touched her in a sexual way and when he tapped her on the shoulder in the

_____

[9]   No party has made a copy of the charge a part of the record, and the court does not know what it alleged.  Nonetheless, the defendants have not argued that the claims now before the court are not encompassed within the scope of the charge.

[10]   Both of plaintiff's Title VII claims are stated against "all defendants," but the court notes that a Title VII claim is valid only against an employer, which, the evidence indicates, was Southlaw, P.C.   Accordingly, the court considers the sexual harassment and retaliation claims to be lodged against only defendant Southlaw, as the plaintiff's corporate employer.  Busby v. City of Orlando, 931 F.2d 764, 772 (11th Cir. 1991); Hinson v. Clinch County, Georgia Bd. of Educ., 231 F.3d 821 (11th Cir. 2000). Insofar as plaintiff intended to sue Liddon individually under Title VII, his motion for summary judgment will be granted as to such claims.  Although Liddon is not an "employer" for purposes of Title VII, he unquestionably was the plaintiff's supervisor for those purposes.  As a supervisor, his conduct is attributable to the employer for Title VII liability purposes.

courtroom at her boyfriend's arraignment; and (4) Liddon intentionally inflicted severe emotional distress upon her by firing her publicly during the courtroom incident.[11]

The defendants seek summary judgment on all of Grimes's claims, asserting that: (1) most of the Title VII claims are time-barred; (2) the conduct complained of as sexual harassment did not rise to the level necessary to sustain a hostile work environment claim based on gender; and (3) the retaliation claim is due to be dismissed because Southlaw has given a reason for her termination and that reason has not been shown to be a pretext. As to Grimes's state law claims, defendants seek summary judgment on the outrage claim on the basis that the conduct complained of does not rise to the level of egregiousness necessary to be actionable under Alabama law. Defendants further seek dismissal of the assault-and-battery claim on grounds that the conduct does not constitute an actionable assault under Alabama law. Each claim and its applicable defenses will be examined in turn.

---

[11] Both of plaintiff's state-law claims are set forth as claims against "all defendants," but appear to be based solely on the conduct of the individual defendant. Plaintiff's complaint alleges that Liddon was a "partner"; however, the undisputed evidence establishes that he was a shareholder in and employee of Southlaw P.C. It would appear, therefore, that she is basing her state-law claims against Southlaw on a *respondeat superior* theory, asserting that Southlaw is vicariously liable for the torts of its employee, Liddon.

## III. DISCUSSION

### A.  Title VII Sexual Harassment

As noted in footnote 10 above, the courts treats the Title VII claims as being alleged only with respect to defendant Southlaw, P.C., plaintiff's undisputed employer.  Insofar as the plaintiff has attempted to allege Title VII claims against Liddon individually, his motion for summary judgment will be granted, and the Title VII claims against him will be dismissed with prejudice. Southlaw argues that the Title VII claims against it should be dismissed because they are untimely filed.  Further, it contends that the hostile work environment claim fails because the plaintiff has failed to show that the harassment was so severe and pervasive as to alter the terms and conditions of her employment.  It asserts that plaintiff's retaliation claim must fail because she has failed to present evidence to create a genuine issue of material fact concerning whether the defendant's articulated reason for her termination was a mere pretext for retaliation.

### 1.  Timeliness

Southlaw asserts that Title VII requires a plaintiff to file a charge of discrimination with the Equal Employment Opportunity Commission within 180 days of the alleged violation and that failure to timely file is fatal to a Title VII claim.  There is,

however, an exception to the 180-day limitation for conduct that constitutes a continuing violation.  <u>See, e.g.,</u> <u>Roberts v. Gadsden</u> <u>Memorial Hospital</u>, 835 F.2d 793 (11th Cir. 1998).  A hostile work environment is such a claim.  <u>National Railroad Passenger Corp. v.</u> <u>Morgan</u>, 536 U.S. 101, 122 S. Ct. 2061, 153 L. Ed. 2d 106 (2002); <u>Watson v. Blue Circle, Inc.</u>, 324 F.3d 1252, 1258 (11th Cir. 2003)("The [Supreme] Court instructed that a hostile work environment, although comprised of a series of separate acts, constitutes one 'unlawful employment practice,' and so long as one act contributing to the claim occurs within the filing period, 'the entire time period of the hostile environment may be considered by a court for the purposes of determining liability.'").  The issue, then, is whether the conduct complained of was part of a continuing pattern of harassment that continued into the 180-day limitations period.  The frequency of the conduct is one factor that is relevant to a determination of whether the conduct may constitute a continuing violation.

In this case, Grimes testified that up until the month that she was fired, Liddon frequently asked her to sit on his lap, asked her to pick up his pen so he could look down her shirt, and sent her sexually suggestive e-mails.  He also put his hand on her buttocks and thigh.  Viewing the evidence in the light most favorable to the plaintiff (even though plaintiff has not argued that the conduct constitutes a continuing violation) the court

finds that the alleged sexually harassing conduct constitutes a continuing violation, and the time-bar does not preclude Grimes's claim of hostile environment.   The evidence before the court, viewed most favorably for Grimes, fails to show that defendant Southlaw is entitled to judgment as a matter of law.   Consequently, Southlaw's motion for summary judgment as to the claims of sexual harassment on the basis of time-bar is due to be denied.

2.   <u>Hostile Work Environment</u>

In order to sustain a Title VII claim for harassment sufficient to create a hostile work environment, the plaintiff must demonstrate that: (1) she is a member of a protected group; (2) she was subjected to unwelcome sexual harassment; (3) she was subjected to such harassment based upon her gender; (4) the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) there exists a basis for holding the employer liable.   <u>See</u> <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1245 (11th Cir. 1999).   An employer is vicariously liable to a victimized employee where the hostile environment has been created by a supervisor "with immediate (or successively higher)" authority over the employee.   <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807, 118 S. Ct. 2275, 2292-93, 141 L. Ed. 2d 662, 689 (1998).

16

For purposes of Southlaw's current motion, it does not dispute the first, second, third, or fifth elements of the claim.  For this motion, Southlaw admits that plaintiff is a woman and a member of a protected group, that she was subjected to unwelcome sexual harassment due to her gender, and that Liddon had supervisory authority over the plaintiff.  Defendant Southlaw's motion asserts that the conduct was not sufficiently severe or pervasive as to constitute violations of federal law.  In particular, Southlaw argues that plaintiff herself subjectively did not view Liddon's conduct as sufficiently offensive to alter the terms and conditions of her employment with Southlaw.  (See defendant's brief at page 10).

In most sexual harassment cases, there is little question that the victim found the conduct *subjectively* offensive, and the court must resolve the issue of whether the conduct is *objectively* offensive or would offend a reasonable employee.  In the case at bar, however, the court has little difficulty finding that the conduct was objectively offensive.  A reasonable female employee would find Liddon's almost constant touching, grabbing, vulgar comments, e-mails, and propositioning to be offensive to the degree that it would affect the employee's job conditions and performance. The issue in this case, however, is whether plaintiff herself subjectively found the conduct to be sufficiently offensive to alter *her* conditions of employment.

17

The Eleventh Circuit Court of Appeals recently examined the "severe and pervasive" element of a Title VII sexual harassment claim in Gupta v. Florida Board of Regents, 212 F.3d 571 (11th Cir. 2000). The court in Gupta observed that the requirement is critical to prevent the courts from turning ordinary workplace socializing into discriminatory conduct. Id. Such ordinary socializing was deemed to include the "sporadic use of abusive language, gender-related jokes, and occasional teasing" as well as horseplay and intersexual flirtation. Gupta, *supra*.

Likewise, in Mendoza, the court of appeals explained:

> Although Title VII's prohibition of sex discrimination clearly includes sexual harassment, Title VII is not a federal "civility code." Oncale v. Sundowner Offshore Services, Inc., 523 U.S. 75, 118 S. Ct. 998, 1000-02, 140 L. Ed. 2d 201 (1998) ("We have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."); Faragher v. City of Boca Raton, 524 U.S. 775, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) ("A recurring point in these opinions is that 'simple teasing,' offhand comments, and isolated incidents (unless extremely serious) will not amount to discriminatory changes in the 'terms and conditions of employment.'" (internal citation omitted)); Meritor [Savings Bank, FSB v. Vinson], 477 U.S. at 67, 106 S. Ct. 2399 ("Not all workplace conduct that may be described as 'harassment' affects a 'term, condition, or privilege' of employment within the meaning of Title VII.").

Id. at 1245.

The defendant correctly asserts that the Supreme Court has recognized that it is not enough for Grimes to show that her

workplace was offensive; rather, she must show that the office where she worked was so permeated with discriminatory intimidation, ridicule, and insult that a reasonable person would perceive the environment as hostile or abusive.  See Meritor Savings Bank v. Vinson, 477 U.S. 57, 67, 106 S. Ct. 2399, 2405, 91 L. Ed. 2d 49 (1986).

In determining if this critical element of a sexual harassment claim has been met, the court must look to the frequency, severity, and pervasiveness of the conduct complained of.  Again, the court of appeals has said:

> The objective component of this analysis is somewhat fact intensive.  Nevertheless, the Supreme Court and this Court have identified the following four factors that should be considered in determining whether harassment objectively altered an employee's terms or conditions of employment: (1) the frequency of the conduct; (2) the severity of the conduct;(3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance.  Allen v. Tyson Foods, 121 F.3d 642, 647 (11th Cir. 1997) (citing Harris, 510 U.S. at 23, 114 S. Ct. 367).  The courts should examine the conduct in context, not as isolated acts, and determine under the totality of the circumstances whether the harassing conduct is sufficiently severe or pervasive to alter the terms or conditions of the plaintiff's employment and create a hostile or abusive working environment.  Id.; see Harris, 510 U.S. at 23, 114 S. Ct. 367; Henson, 682 F.2d at 904; Faragher, 118 S. Ct. at 2283 (citing Harris, 510 U.S. at 23, 114 S. Ct. 367, and explaining that "we directed courts to determine whether an environment is sufficiently hostile or abusive by 'looking at all the circumstances'").

Mendoza v. Borden, Inc., 195 F.3d 1238, 1246 (11th Cir. 1999).
Moreover, it has been noted that Title VII may not be used as a
tool to punish "the ordinary tribulations of the workplace,"
Faragher, 524 U.S. at 788, or failure to treat a female employee
with "sensitivity, tact and delicacy," Minor v. Ivy Tech State
College, 174 F.3d 855, 858 (7th Cir. 1999).   The court is not
permitted to police language in the workplace under the guise of
enforcing Title VII.

     In this case, Grimes asserts that she was subjected to
specific incidents of sexual harassment throughout the course of
her 23-month employment at Southlaw.   At least two of these
incidents included physical contact.   The court finds that a
reasonable person may have perceived her working environment as
hostile and abusive, and there is at least a genuine issue of fact
as to this point.

     Even so, the court must examine whether the evidence involves
a genuine issue whether the conduct complained of so altered the
work environment that it "unreasonably interfered with the
employee's job performance." Id.   This factor requires a showing
of both subjective and objective interference with the job
performance. Id.  Having concluded above that the evidence shows
a level of offensiveness sufficient to meet the objective prong,
the question is whether there is a genuine issue of fact that
Grimes subjectively found Liddon's alleged conduct offensive to

her. Absent Grimes herself viewing the conduct as offensive, it cannot be said that the terms and conditions of *her* employment were altered by it.

Although the evidence may be scant due to plaintiff's failure to respond to the motions for summary judgment, the court still finds that there is a genuine issue of fact concerning plaintiff's subjective view of the sexual conduct directed at her. The court has read carefully the plaintiff's deposition submitted by the defendants, and while she often testified that she "laughed" at Liddon's comments and would tell him he was "stupid" or "crazy," she also testified that she was "upset" and "embarrassed" by it. See, e.g., footnote 5, above. Even though the evidence also suggests that she was a participant in sexual banter and that she was the "best" secretary Liddon had ever had, performing her job acceptably until the date she was fired, the court must view the evidence most favorably to the plaintiff. Doing so, there is at least a genuine issue of fact concerning plaintiff's subjective view of the work environment, which precludes a finding as a matter of law that the terms and conditions of plaintiff's employment were not altered by Liddon's behavior. The moving defendant has the initial burden of showing the absence of genuine issues of fact and an entitlement to judgment as a matter of law. For the reasons explained, defendant Southlaw has failed that initial summary-judgment burden.

Southlaw also contends that it is entitled to summary judgment under the Faragher/Ellerth defense that plaintiff failed to report the sexual harassment by Liddon so that corrective measures could be taken.  Southlaw admits that it did not have a promulgated or well-understood anti-discrimination policy, but it contends that such a policy is not "always" necessary.  Nevertheless, the court is persuaded that there are genuine issues of fact that preclude summary judgment on this affirmative defense.  First, defendant has presented no evidence that its employees were aware of any unspoken anti-discrimination policy or any avenues of recourse that were available to deal with sexual harassment.  Indeed, there is no evidence that any such avenues existed.  Second, plaintiff has testified that she was told repeatedly that Liddon was her "boss" and that no one other than Liddon could do anything about her employment status.  Plaintiff had no reason to believe that any recourse was available to her.  Third, it appears to be undisputed that Liddon shared equally in the ownership of the outstanding shares of Southlaw,[12] indicating that no other lawyer at Southlaw had any authority to alter or correct Liddon's behavior.  Given this evidence, there is at least a genuine issue of fact whether plaintiff had any avenue through which to seek help.

---

[12]   Hebson's affidavit plainly states that he, Slate, and Liddon each owned one-third of the shares of stock in Southlaw.

Southlaw's motion for summary judgment will be denied with respect to plaintiff's hostile work environment claim.

### 3. Retaliatory Discharge

Plaintiff further asserts that she was subjected to sex discrimination in that she was fired by Southlaw after she complained to Southlaw that Liddon had sexually harassed her. Grimes has demonstrated that she complained of harassment by having her attorney send a letter to Hebson, and that she was fired just two weeks after Hebson received the letter and while she was on administrative leave during an investigation of the allegations in the letter.  The timing of the dismissal may give rise to a presumption of discrimination, but the presumption may be rebutted if the employer offers a legitimate, nondiscriminatory reason for the employment action.  Once the employer meets its burden of articulating a non-discriminatory reason, the burden shifts back to the plaintiff to show that the reason is either not worthy of belief or that, in light of all the evidence, a discriminatory reason more likely motivated the decision than the preferred reason.  Standard v. A.B.E.L. Servs. Inc., 161 F.3d 1318, 1331-33 (11th Cir. 1998), citing Combs v. Plantation Patterns, 106 F.3d 1519, 1528 (11th Cir. 1997), cert. denied, 118 S. Ct. 685, 139 L. Ed. 2d 632 (1998).  The evidence the plaintiff uses to establish

pretext can be the same evidence put forward to establish her *prima facie* case.

Because the employer has offered a nondiscriminatory reason for the termination, that is that Hebson honestly believed Grimes had taken illegal drugs at work,[13] to overcome the motion for summary judgment Grimes must demonstrate by competent, admissible evidence that the defendant's nondiscriminatory reason is merely a pretext for retaliation against her.  She must show not only that the articulated reason is false, but also that the defendant's true reason for the termination was retaliation.  See Clark v. Coats & Clark, Inc., 990 F.2d 1217, 1228 (11th Cir. 1993).  It is not the duty of this court to evaluate whether the decision to terminate Grimes was fair or wise; employers are free to make unfair or unwise employment decisions so long as they do not violate anti-discrimination statutes.  See Elrod v. Sears, Roebuck and Co., 939 F.2d 1466, 1470 (11th Cir. 1991).

Here, plaintiff's failure to respond to the motions for summary judgment has had an effect on the burdens of proof.  No fact in evidence logically calls into question the credibility of the articulated nondiscriminatory reason.  While the court can view the timing of the firing with some suspicion, the court cannot

---

[13]   Although Grimes denies that she took illegal drugs at work, there is no evidence that Hebson didn't believe that Grimes had done so.  It is the employer's belief – not the truth of the accusation – that bears on the credibility of the articulated non-discriminatory reason.

substitute its own suspicions for evidence that the plaintiff did not or could not produce.  To survive summary judgment, a plaintiff must show more than "mere curious timing coupled with speculative theories."  Raney v. Vinson Guard Serv. Inc., 120 F.3d 1192, 1197 (11th Cir. 1997) citing Goldsmith v. City of Atmore, 996 F.2d 1155, 1163 (11th Cir. 1993).  Summary judgment cannot be avoided by arguments "based on hunches unsupported with significant probative evidence."  Raney, 120 F.3d at 1198.  The court's job is to consider whether the evidence submitted by the parties "presents a sufficient disagreement to require submission to a jury."  Combs, 106 F.3d at 1526.  The only evidence before this court indicates that the termination was made due to concerns separate from Grimes's accusations of sexual harassment, and while Hebson's own statement is self-serving and subject to some scepticism, it has not been shown to be unworthy of belief.  Consequently, Grimes has failed to meet her secondary burden of showing that Southlaw's stated reason for her termination was pretextual, and the claim of retaliation also is subject to summary judgment in favor of the defendant.

**B.  State Law Claims**

    1.  Assault and Battery

At count III of the complaint, plaintiff alleges that both defendants are liable to her for assault and battery perpetrated by

Liddon, both by his sexual touching of her in the workplace and when he "tapped" her on the shoulder in the courtroom and fired her in November 2001.

The Alabama Supreme Court recently elaborated on the law of assault and battery in Alabama, saying:

> The plaintiff in an action alleging assault and battery must prove "(1) that the defendant touched the plaintiff; (2) that the defendant intended to touch the plaintiff; and (3) that the touching was conducted in a harmful or offensive manner." Atmore Cmty. Hosp., 719 So.2d at 1193. In Atmore Community Hospital, the plaintiff presented evidence indicating that the defendant "touched her waist, rubbed against her when passing her in the hall, poked her in the armpits near the breast area, and touched her leg." 719 So. 2d at 1194. The plaintiff also presented evidence indicating that "each of these touchings was intentional, was conducted with sexual overtones, and was unwelcome." Id. We held that these factual assertions constituted substantial evidence that the defendant had committed a battery. Id.
>
> In Surrency, we stated that an actual injury to the body is not a necessary element for an assault-and-battery claim. 489 So. 2d at 1104. We also stated that when the evidence as to whether a battery in fact occurred is conflicting, the question whether a battery did occur is for the jury. Id. Quoting Singer Sewing Machine Co. v. Methvin, 184 Ala. 554, 561, 63 So. 997, 1000 (1913), this Court stated:
>
>> "'As to what acts will constitute a battery in a case like this, the rule is well stated by Mr. Cooley in his work on Torts. He says: "A successful assault becomes a battery. A battery consists in an injury actually done to the person of another in an angry or revengeful or rude or insolent manner, as by spitting in the face, or in any way touching him in anger, or violently jostling him out of the way, or in doing any intentional violence to the person of another. The wrong here

> consists, not in the touching, so much as in
> the manner or spirit in which it is done, and
> the question of bodily pain is important only
> as affecting damages.  Thus, to lay hands on
> another in a hostile manner is a battery,
> although no damage follows; but to touch
> another, merely to attract his attention, is
> no battery and not unlawful.  And to push
> gently against one, in the endeavor to make
> way through a crowd, is no battery; but to do
> so rudely and insolently is and may justify
> damages proportioned to the rudeness...."'"

Surrency, 489 So.2d at 1104.

Harper v. Winston County, ___ So. 2d ___, 2004 WL 870456, *6-7

(Ala., April 23, 2004).

Applying these standards to the evidence before the court,

there can be little question that a genuine issue of fact exists

concerning whether Liddon's sexual touching of the plaintiff (e.g.,

grabbing her by the hips, touching her buttocks, and slipping his

hand between her thighs) constituted an actionable assault and

battery.   Like the plaintiff in Atmore Community Hospital,

plaintiff has alleged and testified here that Liddon touched her in

a sexually offensive and unwelcome matter on several occasions.

There is a genuine issue of fact whether these touchings were

unwelcome or subjectively offensive to her, which precludes summary

judgment on this evidence.

On the other hand, the court is equally convinced that Liddon

did not, as a matter of law, commit and assault and battery when he

"tapped" plaintiff on the shoulder and shook his finger in her face

in the courtroom at her boyfriend's arraignment.   Tapping on the

shoulder is culturally recognized in the United States as an inoffensive and accepted manner for getting someone's attention. Likewise, shaking a finger in someone's face indicates an intent to scold a person, but not to touch her.  The very nature of finger-shaking avoids touching in favor or verbal scolding.  Thus, if the evidence shows only that Liddon shook his finger in the plaintiff's face, there is no evidence that he intended to touch her in any harmful or offensive manner.  Without an intent to touch, there can be neither an assault nor a battery.

To the extent that plaintiff attempts to ground her claim of assault and battery on the facts of the courtroom incident, the evidence is inadequate as a matter of law.  Liddon's sexual touching of the plaintiff on multiple occasions, however, may constitute an assault and battery such that his motion for summary judgment on that claim must be denied.

The court is persuaded that Southlaw cannot be vicariously liable for Liddon's conduct.  Under Alabama law, an employer is responsible for the *intentional* torts of its employees only if they are performed in substantial furtherance of the employer's business.  The Alabama Supreme Court has explained:

> In <u>Mardis v. Robbins Tire & Rubber Co.</u>, 669 So. 2d 885, 889 (Ala. 1995), this Court stated:
>
>> "For an employer to be held liable for the intentional torts of its agent, the plaintiff must offer evidence (1) that the agent's

28

wrongful acts were committed in the line and
scope of the agent's employment; or (2) that
the acts were committed in furtherance of the
business of the employer; or (3) that the
employer participated in, authorized, or
ratified the wrongful acts." <u>Potts v. BE & K
Constr. Co.</u>, 604 So. 2d 398, 400 (Ala. 1992).

In Potts, this Court stated:

"The employer is vicariously liable for acts
of its employee that were done for the
employer's benefit, i.e., acts done in the
line and scope of employment or... done for
the furtherance of the employer's interest.
The employer is directly liable for its own
conduct if it authorizes or participates in
the employee's acts or ratifies the employee's
conduct after it learns of the action."

604 So. 2d at 400.

<u>Machen v. Childersburg Bancorporation, Inc.</u>, 761 So. 2d 981, 984
(Ala. 1999). Almost invariably, the Alabama courts have held that
sexual misconduct by an employee, even when occurring at the
workplace, is not done within the line and scope of the employment
or in furtherance of the employer's business. <u>See, e.g.</u>, <u>Machen</u>,
*supra*; <u>East Alabama Behavioral Medicine, P.C. v. Chancey</u>, 883 So.2d
162, 168 (Ala. 2003)("Alabama courts, as well as other courts, have
held that sexual misconduct is personal to the employee and is
outside of the scope of employment"); <u>Mardis v. Robbins Tire &
Rubber Co.</u>, 669 So. 2d 885 (Ala. 1995); <u>Doe v. Swift</u>, 570 So. 2d
1209 (Ala. 1990). Typically, employers are liable only for their
direct failure to prevent or correct such behavior after becoming

aware of it under a theory of ratification or participation in the wrongful conduct.  East Alabama Behavioral Medicine, P.C. v. Chancey, 883 So.2d 162, 168 (Ala. 2003);  Potts v. BE & K Constr. Co., 604 So. 2d 398, 400 (Ala. 1992).

The evidence in this case fails to establish that Southlaw was aware of Liddon's sexual touching of the plaintiff.  Neither she nor Liddon reported the conduct to the employer, and there is no evidence that anyone else reported it.  Although there is evidence that Hebson learned of and put a stop to sexually explicit e-mails among employees, this does not indicate that he or anyone else in management (other than Liddon) was aware of the sexual touching that constituted the possible assault and battery.  Consequently, Southlaw is entitled to summary judgment with respect to this state-law claim against it.

### 2.  Tort of Outrage

Plaintiff's final claim, set forth in count IV of the complaint, alleges that Liddon and Southlaw are liable to her for the tort of outrage based on Liddon's public firing of her in the courtroom during her boyfriend's arraignment and his sexual touching of her.  Oddly, except for one sentence in paragraph 51, count IV focuses almost entirely on the courtroom incident.

The tort of outrage has been defined in Alabama as follows:

The tort of outrageous conduct was first recognized by this Court in American Road Service Co. v. Inmon, 394 So.

30

2d 361 (Ala. 1981), in which the Court held that "one who
by extreme and outrageous conduct intentionally or
recklessly causes severe emotional distress to another is
subject to liability for such emotional distress and for
bodily harm resulting from the distress." Id. at 365.
In order for a plaintiff to recover, the conduct of the
defendant must be "so outrageous in character and so
extreme in degree as to go beyond all possible bounds of
decency, and to be regarded as atrocious and utterly
intolerable in a civilized society." Id.

Busby v. Truswal Systems Corp., 551 So. 2d 322, 324 (Ala. 1989).

Generally, sexual harassment has been regarded as a form of

outrageous conduct recognized as fitting within the definition of

the tort. See Potts v. Hayes, 771 So. 2d 462 (Ala.

2000)("egregious sexual harassment" one of limited forms of

outrage); Stabler v. City of Mobile, 844 So. 2d 555 (Ala.

2002)(same); Callens v. Jefferson County Nursing Home, 769 So. 2d

273 (Ala. 2000)(same); see also Phillips v. Smalley Maintenance

Services, Inc., 711 F.2d 1524 (11th Cir. 1983).

In this case, the court believes that sufficient evidence is

present to make a jury issue of the harassment of plaintiff by

Liddon.  Plaintiff testified that her harassment involved lewd

comments, ogling, propositioning, and physical touching and

grabbing on an almost constant basis.  While it possible that a

jury may not find that this rises to the level of being

sufficiently "egregious," the court cannot say as a matter of law

that it does not.  One need only compare the facts of this case

with those in Busby to conclude that the egregiousness of the

alleged conduct here is enough to submit it to a jury. Liddon's motion for summary judgment on this claim will be denied.

For the reasons already addressed above with respect to plaintiff's claim for assault and battery, Southlaw's motion for summary judgment on this outrage claim will be granted. Southlaw could be liable for the intentional misconduct of Liddon only if it ratified it or participated in it, and there simply is no evidence of that.

## IV.  CONCLUSION

Accordingly, consistent with the foregoing discussion of the evidence presented, this court determines the following:

1.   That there are genuine issues of material fact that preclude summary judgment in favor of defendant Southlaw on plaintiff's claim under Title VII for hostile work environment/sexual harassment. Southlaw's motion for summary judgment will be DENIED with respect to this claim.

2.   That there are no genuine issues of material fact and that Southlaw is entitled to judgment as a matter of law with respect to plaintiff's Title VII retaliation claim. Southlaw's motion for summary judgment will be GRANTED on this claim.

3.   That the Title VII claims for hostile work environment/sexual harassment and retaliation against defendant Liddon are also due to be dismissed because he was not the plaintiff's "employer"

for Title VII purposes.  Liddon's motion for summary judgment will be GRANTED as to these claims.

4.   That there are no genuine issues of material fact and defendant Southlaw is entitled to judgment as a matter of law with respect to plaintiff's state-law claims of assault and battery and the tort of outrage.  Southlaw's motion for summary judgment will be GRANTED on these claims.

5.   That there are genuine issues of material fact that preclude summary judgment for defendant Liddon with respect to plaintiff's state-law claims for assault and battery and the tort of outrage.  Liddon's motion for summary judgment on these claims will be DENIED.

A separate order will be entered in accordance with the findings set forth herein.

Dated the 28th day of December, 2004.


_____
T. MICHAEL PUTNAM
U.S. MAGISTRATE JUDGE